Thank you sir. Good morning. If it's all right, I want to start by telling you what Officer Creck said on the night of the shooting to BCA investigators in a he goes down to the ground, what happened? You said he kind of went down to a prone position or he kind of fell down near where you were. What happened there? Answer. He stopped, told him to put his hands out, keep your hands out, keep your hands out, which he did. And then he didn't move. And we told him not to move. And he didn't. That's what they said the night of this shooting. This court said in Williams v. Holly and in Wilson v. Des Moines that district courts in summary judgment motions and officer shooting cases must consider evidence that is inconsistent with an officer's version of events. That is just because they're the only surviving witnesses doesn't mean that district court can't consider contradictory evidence, including contradictions within an officer's account, contradictions between officer accounts, contradictions between an officer's account and physical evidence or forensic evidence or other eyewitness testimony. Now we have all of that here, nearly none of which was considered by evidence. I have eyewitness testimony from someone who was ten feet away from Henderson as he was shot from someone who happens to be an officer defendant in this case, saying that events occurred exactly as plaintiff is saying they occurred in this case. Yet not a word of that was considered by the district court in summary judgment. That is not and cannot be the Rule 56 standard in this circuit. How did that happen? Did you have oral argument on this motion? Yes, sir. Did you start your argument with Judge Kyle the way you did here and he still didn't even mention it or did it was it more subtle or something? Sir, in our briefs, we bolded it, we underlined it. I've said it at the argument, maybe not in this way, sir, because frankly, I was stunned that it wasn't mentioned in his opinion. And so I thought, let me start this way. But it was bolded, it was underlined, it was a part of our argument. I don't know how it didn't end up even being considered. But honestly, your honors, and not to be frankly, most of our evidence wasn't considered. I mean, it's almost as though, I mean, this case is not about official immunity or qualified immunity. This is more fundamental Rule 56. Before you get to the qualified immunity standard, you first have to take all the facts in the light most favorable to the non-moving party. And before you do that, you first have to take all the facts and consider them. And so if we haven't taken all the facts. What are the facts in your favor that the district court didn't consider? Yes, sir. So the first one was Officer Kreck's prior statement. As we said, from the night of the incident, saying that Mr. Henderson complied with commands on the ground and showed his hands. Because your point is that in the light most favorable to you, his hands were outstretched when he was shot. Is that the argument? Yes, sir. You say that if that were true factually, then no reasonable officer could have fired on him. Well, yes, sir. At least a jury could find that because the officer's central thesis. No, it's not just a jury. That's a legal question. Whether the use of force was reasonable is a legal question and certainly qualified immunity is a legal question. So for it to be a material dispute of fact, I think you'd have to say if his hands were out as you say this witness says, then it was clearly established that it was unreasonable to shoot him. Yes, sir. Is that why is that the case? Yes, sir. So if he was complying with the commands, if Officer Kreck was correct, the night of the shooting, and if this hostage came out, got down on the ground, got down on the ground, laid in a prone position in response to officer commands, showed both of his hands, and showed he was unarmed, there is no case at least that I'm familiar with that says officers would be entitled to qualified immunity for opening fire on a prone hostage with his hands out. Well, when you say hostage, I mean- A prone person. Even a suspect, sir. Even had a- I don't know whether even in the light most favorable to your client, the officers knew he was a hostage. So on that, that's what Judge Kyle said also, except in order to do that to get to the Chief Judge's question, one of the pieces of evidence that was disregarded was an eyewitness testimony. John Miatky, who was a business traveler staying in a hotel room, he said he heard the officers outside talking about this hostage situation, saying there's a suspect inside, he has hostages, he has a gun before the shooting occurred. They didn't necessarily know Henderson was one of the hostages as opposed to the perpetrator. Because he came out at the time of a gunshot and I thought you weren't even challenging the shooting while he was running. That's true for a couple reasons. So I would concede, I agree with you, sir, that they didn't know he was a hostage versus a suspect. But in some ways, it doesn't- I'm sorry, you're overstating your case then if they didn't know he was a hostage. But even assuming he was reasonably believed to be the shooter, once he's down with his hands out, it's clearly established, you say, that it was unreasonable to shoot him. Yes, sir. If he's complying with officer commands, if he shows that he's unarmed, and by the way, that's the central thesis for why the officers say they shot him. The officers now say, their current version of events, is he was hiding his hands. And when he was on the ground, they gave him commands to show his hands, he didn't. And instead, he bladed upwards towards them and brought his hand underneath, so they had in that moment to shoot him, which probably would be protected by qualified immunity. But if the night of the incident, they're saying, no, in fact, he complied with commands on the ground and he showed his hands, which is also, by the way, consistent with the photographic evidence that the district court did not consider of Mr. Henderson with both of his hands out. We included that in the brief as well. Was the photographic evidence excluded or did the court make any affirmative statement regarding it? Yes, the court just said, well, that was a photo taken after the incident. So that doesn't prove what happened during the incident. But my point is, if that photo taken after the incident is consistent with what Crack said happened during the incident, then I think jurors could put two and two together and say, well, maybe what Crack said the night of the incident is what actually happened. And what the officers are saying now is not what happened. What do they say now about how his hand ended up as in the photograph? I'm so glad you asked, Judge. That's actually how I started off. You asked, Your Honor, how I started off the last oral argument. And you're absolutely right. It doesn't make any sense as to why his hands would end up like this if he was blading underneath like this. I didn't say it didn't make any sense. I asked what is their testimony as to why it ended up that way? They said, I don't know. To a person, they say, I don't remember. I can't demonstrate. I don't know. I can't tell you that. Every single one of the officers who presumably were very acutely focused on this man on the ground, not a single one has an explanation for why his hand isn't towards them, but rather came to rest in this outstretched position as documented by the photograph. And again, the court didn't wrestle with that question either. The lower court didn't. So that was another point, Chief Judge, that the court didn't consider in its summary judgment. You have others? Yes, sir. I think you've listed three now. Sir, multiple witnesses, eyewitnesses said that Henderson left that room with both of his hands up and walked down the hallway. The officers said that they didn't look at his hands, so they don't know whether they were up or not. The district court didn't consider either the officer testimony that his hands were up. How is that material to anything, though, if you're not challenging what happened while he was? Because, yes, sir, so our expert, which also wasn't considered by the district court, says that the very first thing a reasonable officer would have done, had they known this was a hostage situation and thought that someone was armed, was look at their hands. And so if a reasonable officer would have looked at this person's hands as he was walking down the hall, presumably that would be one more thing or one more reason that they knew or should have known that he was unarmed when he was laying on the ground. Additionally, the district court didn't consider Officer Ofsted's concession that he gave contradictory commands to Henderson that Henderson could not comply with. Officer Ofsted, at his deposition, said that the commands he shot Henderson for disobeying when he was on the ground were to stop moving and show me your hands. He conceded that Henderson could not both stop moving and show him his hands at the same time and that he would have shot regardless because this was an impossible set of commands to comply with. The district court didn't consider that either. Furthermore, the district court ruled it undisputed that Officer Ofsted issued a warning prior to opening fire. The district court said it was undisputed that Ofsted said stop or I'm going to shoot before he opened fire, even though Ofsted had multiple prior statements, including the night of the incident and his answers to interrogatories, where he made no mention of such warning. Presumably... Is there a case that you rely on that says it's clearly established that a warning is required before shooting? Yes, sir. I think that's... I don't recall it because that would be a question, right? If you're saying... Yes. If you're saying even before shooting a non-compliant person, you must give a warning, we'd need a case probably that says that's... Yes, sir. And I think that is pretty well established in this district. I'll go in this circuit. I'll look and so the way that they'll say that they'll say, well, it wasn't feasible, except... Except leave their testimony about the blading action and so forth, then it would not be feasible. So this is all tied back to your first point about crack and if the hands were out. Right. And also... Yes, sir. That's right. But Ofsted testified at his deposition that he did give that warning. So I don't see how he can say that it's not feasible to give a warning if we're going to look at his prior statements to say that maybe he didn't actually give this warning, but in fact he did give the warning. I don't think they can have it both ways, but none of that... Of course, he may be thinking back over the sequence when he's testifying too. I'm sorry, your honor? He may be thinking back over the sequence as he's testifying. That's right. He may. So he may... I agree, your honor, that a jury... It doesn't necessarily mean that he's not telling the truth, that he has these inconsistent statements. A jury could very well credit him and it doesn't necessarily mean that even Officer Crack is not telling the truth. The jury... A jury could believe the officers and say, you know what, we believe... The only point I'm making is that there is evidence from which a jury could go the other way. It is... If I'm that they would be willing to say, you know what, an officer could also... Excuse me, a jury could also believe the initial statements that were given and might conclude that they were telling the truth then. That's the only point I wanted to make, your honor. Mr. Marty, you're into your rebuttal. You can continue if you like or reserve. Maybe just one more minute, sir. So the district court didn't address the physical impossibility of how Henderson's hands ended up outstretched if he took the actions the officer said. The district court didn't address our expert testimony regarding contagious fire. In fact, the district court drew an inference against Mr. Henderson because he complied with officer commands. The district court said because Henderson complied with officer commands and went to the ground, that shows that he retained control of his movements and therefore was a greater threat to the officers. They're setting up a Now, a jury may find that, but my understanding of Rule 56 is that at that stage, inferences must be granted to the non-moving party. And an inference that could be granted from someone going to the ground in response to officer commands is that they're complying with officer commands. It's flipping Rule 56 on its head. So there were a number of... And the last point I'd sit down is this case seems directly on point with the Tolan v. Cotton case with the U.S. Supreme Court, where they reversed summary judgment that had been affirmed by the Fifth Circuit. And the Supreme Court said, quote, under either prong of qualified immunity analysis, courts may not resolve disputes of fact in favor of the party seeking summary judgment. In cases alleging unreasonable searches and seizures, we've instructed the courts to define the clearly established right at issue on the basis of the specific context of the case. Accordingly, courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions. I'd reserve the balance. Thank you, Mr. Madia. Thank you, sir. Ms. Ruby? May it please the Court, Counsel, my name is Vicki Ruby, and I represent Officers Anthony Ofsted, Stacey Crack, Natalie Bauer, and the City of Woodbury. In the amount of time it took me to make that introductory statement, the officers had to respond to hearing a gunshot simultaneously with a man running at them and defying their commands. He'd sprinted at them from a room where they'd previously had a gun pointed at a uniformed officer's head. The quiet deliberation of this courtroom was not available to the officers. This is precisely the type of tense, rapidly evolving circumstances that this court has routinely found officers are entitled to qualified immunity. Counsel, did the circumstance change once the individual stopped and assumed a prone position on the ground? This remained a tense circumstance where they did not know that Mr. Henderson was not an armed gunman that fired at him as he was running out of room 217, past room 215, past room 213, coming within 10 feet of the officers. When he went down on the ground, the unrebutted record reflects that he did move in a furtive manner. All of the officers testified consistently. I do want to touch base on Officer Stacey Crack's statement as opposing counsel, raised that issue. Key to that statement and all of her subsequent testimony is the remark whether he was prone. She was asked what he did when he went to a prone position. In her deposition, which is submitted to this court at page 340, she stated that prone is a position of compliance, fully down on the ground where you could see his hands. That's consistent with her BCA statement, which in the sentence after plaintiff's counsel stopped reading to you, she states, our weapons were directed at him until we had sufficient equipment to pull him to safety. It's a later portion of time. Throughout the incident, the officers have always... Again, what are you saying about the statement? The statement says, told him to put his hands out, which he did, and then he didn't move. We told him not to move and he didn't. Now, what are you saying? I'm saying that continues on and we had our guns out there and then somebody else was there and we had cover and with our weapons directed him until we had sufficient equipment to pull him to safety. That she's talking about a later aspect of this incident. And if I may... Hold on. I just want to make sure I understand the argument. You're saying that when she says, we told him to put his hands out, which he did, and then he didn't move. We told him not to move and he didn't. She's talking about the time after he was shot? That's after all shots have been fired. Yes. And the forensic evidence supports that reading of the testimony. Here, we have an autopsy, which has been submitted to the court as a confidential supplemental exhibit. The autopsy references a gunshot wound fired by an officer under plaintiff's version of events. None of the officers' bullets hit him until he was down on the ground. Yet, gunshot wound number one has entry point in his chest. That's not consistent with someone lying prone on the ground. Instead, it corroborates the officer's testimony that he's moving in a furtive manner, lifting his body up with his left hand in a manner that they perceived as preparing to display a weapon and fire upon the officers again. Under those circumstances, this is exactly the same type of tense circumstances that this court commonly and routinely finds qualified immunity for officers. Here, there's an... What do you think the autopsy proves? That he was shot in the chest and therefore he wasn't lying down when he was shot? Plaintiff has consistently taken the position that he was lying down flat on his chest, arms outstretched above his head. That bullet wound to his chest, an entrance wound on his chest, fired by an officer, isn't consistent with being in a fully prone position with your hands over your head at the time an officer fired. Are you saying it's not possible that he could have received that wound prior to lying down? Plaintiff has taken the position that he was not shot by any of the officers prior to laying down. So, I'm assuming the evidence that plaintiff has put forward that none of the officers' bullets has an entrance wound to the chest wouldn't be possible under their version of facts that they've submitted to this court. And again, the evidence does support the officer's testimony that he continued to move in a furtive manner. There simply isn't any other witness testimony that rebuts the officer testimony in this case that he was continuing to move. Well, I guess it depends on whether you think that your interpretation of this correct testimony is the only reasonable reading of it. Would you agree with that? Because if you read it the way the plaintiff reads it, she's saying he had his hands out before he was shot. I disagree with the plaintiff's reading of this. It's also consistent with... Isn't that what we call a fact issue? It isn't a fact issue in this case because there simply is no evidence that rebuts the officer's testimony. Here, the inconsistencies that plaintiff is claiming aren't the type of inconsistencies that was before this court in Wilson or Hawley, where the forensic evidence actually refuted the officer's testimony. Here, the forensic evidence does not refute the officer's testimony. When you read the statement, which I encourage the court to read in its entirety, is consistent with all of her later sworn testimony as she also states that no additional shots were fired by any officers after he was down on the ground. Her version, when she explained in her deposition testimony, down on the ground was when he was prone, when she could see his hands. It's undisputed that shots were fired after Mr. Henderson initially went down on the ground and in any event, this remained... Didn't she then go on to say though that there were no shots fired after he was down on the ground? That's what I'm saying. The original statement? All of the parties agree that there were shots fired when Mr. Henderson momentarily went down on the ground in that bracing-like position. She had consistently explained that he was not down on the ground, not prone, until he was compliant, until his chest was on the ground. Again, that's at her deposition page, APP 340. Well, I'm having a little trouble. Okay. Okay. I thought she testified that he was shot and hit while he was running. What she thought. The officers... I'm not taking that position, but that's what she thought in her statement. The officers weren't clear when exactly he was hit. Her statement does reference that she thought he may have been hit. We... I didn't say may have. Do you believe your rounds hit him? I do. That's what she said. And in any event, whether the officer's rounds hit him or not, the key inquiry in regard to the use of force after he goes down to the ground as whether a reasonable officer confronted with a man, and we're talking this entire incident, occurred within a matter of seconds. He's running at them. All of the shots were very close in time. The more critical analysis is whether all of the officers fired because they viewed him as a continued threat. This court in Noe v. Storley considered whether all of the officers perceived the threat the same way and acted in the same way, and reflecting whether it lended itself to the reasonableness of the use of force. Here, all of the officers that saw Mr. Henderson's movements on the heels of gunfire, as he's sprinting at them, as he's failing to comply with commands, as from a room where they previously had a gun pointed at their head, all of them looked at that constellation, that totality of circumstances. But none of them having seen a gun? No. Officer... Earlier in this incident, Officer Bauer had a gun pointed at her head from approximately six inches away. I'm talking about seeing a gun and the man coming out of the... The officers could not visualize his right hand. They had reason to believe that he was an armed gunman based on their knowledge that there was a gun in that room that he's sprinting at them simultaneously as a shot is fired. That would be akin to this court's decisions in Lock v. Litchfield, or in the Fourth Circuit had a case, McLennan, that Judge Kyle cited where they have a credible information that an individual is armed. That individual was handcuffed in front of his body with another officer saying, he's got a gun, and that officer fired when that was approaching him because it was reasonable to rely on that credible information. Here the officers have credible information. They actually saw the gun. They heard the gun. They see somebody running at them. In light of those constellation facts, they don't need to actually visualize the weapon. In Thompson v. Hubbard, this circuit also recognized that officers don't need to see the weapon before responding to what they reasonably perceive as a deadly threat. What about the position of the plaintiff or the plaintiff's version of the facts that the decedent's right shoulder was up against a wall and that it would have been nearly impossible to bring the arm around and up in the prone position in which the photograph later showed he was positioned? That, I would submit to this court, is nothing more than speculation. The only testimony of the officers, and they do have video depositions which we submitted to this court, in which Tony Ofsted actually demonstrates to the best of his ability what Mr. Henderson did during that movement. But any information that's tried to be extrapolated from the Miyoki photo, which was taken a minute after this incident, doesn't supply the court with the dynamic movements during the relevant time period. The officers all and also provided information regarding how Mr. Henderson came to be in a position that was consistent with the Miyoki photo. That testimony is in the court's record at APP 256, 367, and 341 of each of the officers. And for that reason, I don't think that the Miyoki photo or any claimed impossibility. What do they say about how it came to be in that position? The officers testified that he was moving it at or around his arm, or they could see his arm coming up, but it was moving at or around his shoulder. His body was obscuring his right hand. And at some point, the right hand did come up by the shoulder. And at that point, when they could see the right hand, no further shots were fired. Again, this is an incident that occurred so quickly, expecting each of the officers to describe with minuscule precision each movement of a suspect in a very highly stressful situation down to the minutia of movements is not what this court is asked to do. They aren't asked to Monday morning quarterback, your honors, aren't asked to Monday morning quarterback an officer's decision making. Rather, to look at the situation and say, would no reasonable officer under these circumstances take the action that the officers here did? Because there is a basis to conclude that Mr. Henderson was an ongoing threat throughout this incident, we believe that the district court correctly decided this case. Plaintiff raises several issues to your honors. They're not genuine issues of material fact that merit consideration. Judge Kyle, in fact, actually considered those issues and rejected them. For example, the warning issue this court has held in Lock v. Litchfield in the state of Morgan v. Cook, that prior commands that gave an individual sufficient notice that if they continued to violate those commands and escalated them, a firearm would be used of significance in Lock v. Litchfield. The commands were given over a 15 to 30 second time frame to get down on the ground and the court found that that was sufficient warning for a plaintiff that their continued movement forward would justify the use of deadly force. Here, the whole incident was much less time than 15 to 30 seconds. Similarly, the issue of plaintiff raised whether the hands were visible when he emerged from room 217. That's not a genuine issue of material fact. John Miojki, who is in room 211 down the hall, testified that his right hand remained near his waist, that he had a better vantage point than the officers who are taking cover behind the alcove. And this court has repeatedly recognized that, again, you don't need to see a weapon to determine that a threat of great bodily harm exists and a hand near a waist is a common area where a weapon could be located. The plaintiff also raises allegedly contradictory commands. All of the commands that were issued by the officers advised Mr. Henderson that he needed to immediately surrender. Those are the type of commands that both the Second Circuit in Massaro and the Sixth Circuit in Sheffie have found consistent to give a suspect fair warning that they must immediately comply. Again, this is a qualified immunity case, and it's a case where a plaintiff has made no effort to even identify what the status of the clearly established law was. That needs to be particularized to the facts of the case. We've submitted several cases that we believe are factually analogous, including the McLennan case and the Milstead case, as well as several other cases cited in our brief. Because the officer's action was objectively reasonable in viewing Mr. Henderson as a threat of great bodily harm, their use of deadly force is reasonable. Officers are not liable for bad guesses in gray areas. Here, because plaintiff cannot establish that no reasonable officer presented with the circumstances that the on August 31st, 2012, would have reacted in the same way, they're entitled to qualified immunity, and we'd ask that you affirm. Thank you, Ms. Ruby. Thank you. Mr. Maria, I think you have a minute or so for a vote. Your Honor, two very quick points I wanted to make. One, they're trying to make this all into one big incident and say, well, look, if the shots were reasonable coming out the door, then they must have been reasonable on the ground. There's no, all of the officers testified, and this is at footnote 66 in my principal brief, that they stopped firing when he went to the ground because they perceived it as he was obeying their commands. They said, we stopped firing, and therefore, they said that they reopened fire because he bladed up towards them and didn't comply with their commands. So the officers themselves said this was two separate uses of force, and that's how Judge Colleton analyzed it also. The second thing to your question, Judge Colleton, about the context of Officer Craig's statement, she said it again. On App 874, in addition to the quote we were looking at earlier, she said, I opened fire. Other officers What page are you on there? Yes, sir. I'm on appendix 874, and sir, I'm at, towards the bottom half, there's like a, there's no line numbers, unfortunately, but it just says SK, and it's got a, that's Stacey Craig, and it's got a big paragraph. Yeah. Go ahead. Yes, sir. And it says, I opened fire. Other officers did too, because I had ringing in my ear. He makes it up to like the vestibule point where the stairs come up, like a landing area, and he stops and lays down right there. So we don't know if he's got a weapon or anything. We order him to keep his hands where we can see him, and he keeps his hands out. So that's twice where she says the same thing. So as the Chief Judge pointed out, if this is a context issue, it's a fact dispute by itself, but there's two separate points where she says the same thing. She doesn't mention anything about this push-up or this blading or anything like that. Judge Kyle said this was a close call without considering nearly any of our evidence. With consideration of this evidence, this can't be a close call. A jury should determine this. Thank you very much. What about the gunshot wound to the chest? She says the autopsy shows that. You take the position that he was not shot while he was coming down the hallway. How could that be consistent with firing at him while he's on his front, on his stomach? Yes, sir. So you're right, Judge, that Officer Crack said that they didn't shoot at him at all when he was on the ground, because this was before the forensics came back. So in 875, she says, nope, we didn't shoot at him when he was on the ground. Forensics came back during this case, and I think both sides agree that all 12 shots, in fact, were while he was on the ground. Her point is that, so our expert says that some of the shots can ricochet up, so that if someone is on the ground, unless they're 100 percent flat like a line, the shots can ricochet up if officers are shooting. But I thought your position was he was 100 percent flat, and that's why it was unreasonable to shoot him. It is, Judge, except when we say 100 percent or not, so our expert's saying even if someone's, can I show you something, Judge? So if someone can be on the ground and have their hands up like this so that both hands are visible and someone's on the ground, but bullets can still ricochet off the ground and get them unless their whole torso is on the ground, etc. So many of these bullets were sort of ricochets like that, and at any rate, that's all sort of a fact issue that a jury needs to sort through. Thank you. Thank you, Mr. Mario. Thank you also, Ms. Ruby, for your presence and the argument you've provided to the court this morning. We will take the case under advisement, render decision due course.